USDA

United States Department of Agriculture

Research, Education, and Economics
Agricultural Research Service

April 23, 2008

CERTIFIED MAIL – RETURN RECEIPT REQUESTED 7001 0360 0003 4297 3724

IN REPLY
REFER TO: Contracting Officer's Final Decision
Certified Claim for Termination Costs and Expenses
Contract No. 50-3K16-3-3600

Mr. Naeem Uddin
Grace & Naeem Uddin, Inc.
5532 NW 72nd Avenue
Miami, Florida 33166

Dear Mr. Uddin:

This is in response to your certified claim that was received in this office on November 9, 2007. Your claim is for $1,656,061.50 and based on your assertion that your company was wrongfully terminated for default on August 2, 2005. Your claim is denied based on the following:

A contract was awarded to your company, Grace & Naeem Uddin, Inc. (GNU), on October 1, 2003, for the Construction of the Subtropical Horticulture Research Center (SHRC) Laboratory Facility Consolidation, in Miami, Florida. A Preconstruction Conference was held at the SHRC on December 1, 2003, during which administrative and technical matters were discussed, including the roles and responsibilities of all parties involved in the contract. The Notice to Proceed (NTP) with construction was issued on January 8, 2004, identifying a completion time of 560 calendar days (July 21, 2005) after receipt of the NTP, which you acknowledged by signing and dating it on January 12, 2004. A Partnering Session was held on February 26, 2004, in Miami. It was conducted by a professional facilitator to encourage the formation of a cohesive partnership among your company and major subcontractors, personnel with the Architect-Engineering (A-E) design firm involved in the project, and Government personnel. There were a total of ten (10) contract modifications issued prior to the termination for various changes and which provided 27 additional days, extending the contract completion date to August 17, 2005.

ARS



EXHIBIT
ALL-STATE LEGAL®
"I"

You stated in your claim that the plans and specifications provided to GNU were ambiguous or deficient with respect to several critical aspects of the project. Contract law, and good business practice, requires a contractor to carefully review the specifications and drawings prior to submitting an offer. The solicitation was issued on July 17, 2003; a Pre-Bid Conference and Site Visit, which you attended, was held on July 29, 2003; and the bids were opened on August 28, 2003. You received the solicitation package on or about July 24, 2003, and had approximately 30 to 35 days to review the plans and specifications and ask for clarification of any issues. In a letter dated September 16, 2003, prior to awarding GNU the contract, the Government requested that you verify your bid because your prices differed significantly from the Government's estimate for the base bid and all options. In this letter, the Government also requested that you consult the specifications and drawings in the original solicitation and amendments to ensure that you had a complete understanding of the requirement. You responded in a letter dated September 23, 2003, that you stood fully behind your bid for the base bid and all options and that you would complete the project as per the plans and specifications and all amendments.

In your claim, you stated that you raised issues and concerns regarding the plans and specifications in a meeting on or about March 15, 2004 (5-1/2 months after contract award). Contract law requires that any ambiguities and perceived deficiencies be brought to the Government's attention prior to bid opening, not after award or during performance. If a contractor or subcontractor(s) comes across item(s) of work they overlooked and omitted when preparing their bid, there is no legal requirement for the Government to make the contractor whole as a result of such omissions.

You stated that there was no available window system that satisfied all of the requirements included in the plans and specifications. Again, the time to bring up such an allegation was prior to bid opening. The first set of material submittals you transmitted for approval was in April 2004 which was returned to you for revision and resubmission. Submittals on the aluminum windows were submitted by GNU in January and February 2005 and returned with the requirement that the data be revised and resubmitted. According to your correspondence, the system chosen and agreed to by GNU and the Government necessitated modifying an existing system and required Miami-Dade County approval prior to installation. Consequently, you allege that this caused you to incur delays and increased costs for which you requested an additional $356,660 and 149 calendar days. You were advised that the construction contractor was responsible for the design of the window system. The specifications in Section 08520--Aluminum Windows, Part 2, Paragraph 2.1, 5th sentence states, "*Design* windows to accommodate hardware, glass, weatherstripping, screens, and accessories to be furnished. (*Emphasis added.*) Also, in Section 08520, Part 2, Paragraph 2.2.1 states, "*Design* windows and rabbets suitable for glass thickness shown or specified." (*Emphasis added.*) Further, Note 11 on Drawing S100 states, "All non-primary structural elements such as railings, metal studs, *storefronts, mullions*, etc., shall be designed by a registered engineer to meet the minimum requirements of the local building codes. Submit calculations and shop drawings with a signed seal of the responsible registered engineer for the local jurisdiction." (*Emphasis added.*) Thus, the window system (the components of which would include storefronts and mullions) was to be

designed by a registered engineer employed by the successful contractor in some capacity and the calculations and shop drawings were to be sealed and submitted by that engineer. Numerous discussions and meetings were held to resolve this issue beginning in early 2004. The window system was not installed prior to the termination of August 2, 2005.

GNU attended the Pre-Bid Conference and Site Visit and received and acknowledged all five (5) solicitation amendments. At no time was any question raised by GNU, any of the attendees, or other companies who received the solicitation package, concerning the design specification for the window system or Miami-Dade County Code Compliance Office requirements. It is incumbent on the contractor (and subcontractors), prior to submitting a bid, to conduct a review of the solicitation package, specifications, and drawings in such a manner to ensure that all necessary reviews by local code authorities and lead times are taken into account. Given that your company is located in Miami, Florida, one could presume that GNU would be familiar with the codes, local conditions, requirements, and response times from the Miami-Dade County Code Compliance Office and would take into consideration such requirements and timeframes in your bid and construction schedule. Further, the proposal you submitted contained items of work and costs that were/should have been included in your original bid, items that are normally included in overhead, and items in general conditions that are inappropriate. It also included an inordinately high number of labor hours and labor categories inappropriate for this task, stated overhead and profit charges/rates that exceeded the percentage allowed by contract, as well as an unusually high number of additional days to complete the task.

You stated that that the roof system specified could not be satisfied by any existing products and the roof deck design did not satisfy wind pressure requirements. Again, questions regarding specifications should be brought to the Government's attention prior to bid opening. Amendment Number 5 to the solicitation was issued on/about August 21, 2003 (prior to a contract award), and contained Question No. 86 which raised certain issues concerning the specifications for the roof. The answer provided the requested information and also stated, "During the design phase of this project, Centria was the only standing seam roof that had Miami-Dade product approval. Berridge and Morin would also be acceptable if they could get product approval by Miami-Dade." No other questions regarding the roof were presented.

GNU did not notify the Government of its inability to locate a roofing manufacturer/supplier until May 31, 2005, almost 6 months after rejection of the initial submittal for the standing seam roofing material on/about November 10, 2004. This notification was also 13 months after rejection of the initial roofing material submittals on/about April 28, 2004, and 16 months after NTP of January 8, 2004, and 19 months after contract award of October 1, 2003.

In an effort to encourage the progress of this project, the Government revised the specifications to provide less restrictive parameters for the type and gauge of the material and to change the warranty requirements so as to assist you in locating a suitable manufacturer and to comply with Miami-Dade requirements, as well as meet ARS needs. However, GNU never completed the

installation of the roof or roof deck prior to the termination of August 2, 2005.

You stated that the acid piping system required numerous changes. You submitted an initial proposal, dated December 16, 2004, that was received by the Contracting Officer on May 3, 2005, in which you requested an additional $31,744.50 and 184 additional days. A revised proposal dated July 24, 2005, requested $44,727.46. Your proposals included items of work and cost that were/should have been included in your original bid, over-estimated concrete work, and lacked a credit for work that was to be omitted or was already required by the contract. It also included items that are normally included in overhead, items in general conditions that are inappropriate, an inordinately high number of labor hours, and stated overhead and profit charges/rates that exceeded the percentage allowed by contract. Numerous Requests for Information (RFIs) were answered and sketches provided between December 2004 and February 2005 and numerous discussions were also held during this time period; however, no work was performed on this task prior to termination on August 2, 2005.

You stated that the plans and specifications for providing power to the lift station did not properly specify how to supply such power. You submitted a change order request for an additional 257 calendar days and $46,882.02 on May 5, 2005. Numerous discussions and correspondence were exchanged among all the parties. You were advised that a performance specification was included in the specifications and drawings. Sheet C701 provided information on the amperage, voltage, and phase requirements for each pump station. Sheets C701 and C401 directed the contractor to coordinate with Florida Power & Light (FPL) regarding the location of power lines and point of connection. You were advised that you were to field verify locations, coordinate with FPL, and provide wiring and conduit to connect the lift stations that would have required excavation of two (2) trenches, each would be approximately 1 foot wide by 2 feet deep; one (1) trench was to be approximately 40 feet in length and another approximately 80 feet in length. It is the responsibility of the contractor to coordinate all required work of other trades and utility companies. Furthermore, the Government, at its own expense, provided two (2) power panels in March 2004 for you to tie into. Work on this task was not completed prior to the termination on August 2, 2005.

You claimed that the layout of the sewer mains conflicted with existing utilities and landscaping and requested an additional 78 days. The change to relocate the line in a manner that differed from what was indicated on the drawings was suggested by GNU on/about January 26, 2004, as being of benefit to both the Government and GNU; however, GNU did not submit a proposed plan or sketch/drawing to accomplish this. GNU submitted an RFI on/about February 5, 2004. A response to this RFI was provided on February 6, 2004, and revised on February 10, 2004. The second response stated that the location of the sewer main is to remain as per the contract documents. This issue was raised in subsequent progress meetings in February and March 2004. During the meeting in March 2004, you were requested to submit drawings of the proposed route and you were advised that the change would be acceptable as long as the reroute was at no additional cost, but if there were additional costs that would be incurred, you were to submit a plan and cost proposal for review and approval. The drawings that were submitted by GNU

on/about May 13, 2004, were reviewed and returned to you on/about May 15, 2004, with instructions to include two additional manholes in the new route and submit a new routing plan. No information was received and in late July 2004, GNU was instructed to install the lines according to the original drawings. You submitted a request dated August 1, 2004, for 78 calendar days for the alleged delay. The Contracting Officer formally denied this request via letter dated October 19, 2004. Work on this task commenced on/about August 13, 2004, and was completed after the termination for default.

You stated in your claim that the plans and specifications were deficient concerning the finish floor elevation. You submitted an RFI on January 23, 2004. Responses were provided on January 28, 2004, February 4, 2004, and February 9, 2004, to increase the elevation 0.5M (approximately 1.6 feet). The change order proposal you submitted for this work was dated January 29, 2004, but was not received by the Contracting Officer until May 24, 2004. In your proposal, you requested $19,928 and 15 additional days. Subsequent proposals were for $24,740 and $38,324.35. Your proposals included costs that were/should have been included in your original bid and costs proposed as direct costs that should be in overhead. They also contained high labor hours, unnecessary administrative labor/tasks, and stated overhead and profit charges that exceeded the percentage allowed by contract, etc. Several attempts were made to negotiate this change. However, agreement could not be reached and a unilateral contract modification (Number 8) was issued for $14,365 and 10 additional days.

In your claim, you make reference to having to wait months for responses to hand-delivered Time Impact Analyses. The fact is, the Government was waiting for you to submit the electronic versions of schedules because they were needed to assess the veracity of information you submitted and to determine the manner of operation and logic of the data and elements in the schedule software.

You also referred to delayed payments and withholding of retainage without contractual basis or cause. It is not apparent that there were any undue delays. When your invoices were received by the Contracting Office, the payments were processed in accordance with the Prompt Payment Act. A retainage of five (5) percent of the billed amount was withheld on the first invoice you submitted for failure to submit required documentation. Ten (10) percent retainage of billed amounts was withheld on the second, fourth, eighth, eleventh, and twelfth payments we processed due to your failure to submit required documentation, deficient or inaccurate work, and/or failure to make satisfactory progress in prosecuting the work. Fifteen (15) percent of the billed amount was withheld on the third invoice you submitted for continued failure to submit required documentation. Two (2) percent of the billed amount was withheld on the fifth invoice received for discrepancies with the floor slab. The last invoice you submitted (our Payment No. 13) was processed and remitted to your surety company, Carolina Casualty of America, in accordance with the Takeover Agreement. The above retainages were withheld as authorized by Federal Acquisition Regulation (FAR) Subpart 52.232-5(e). As of Payment No. 12, you were paid a total of $3,458,178.56, which equates to approximately 49.7 percent of the contract value at that time. The total retainage equaled approximately $104,940; however, as of Payment

No. 12, the retainage appeared to be $64,843.10 which is approximately one (1) percent of the total contract value at that time.

A Cure Notice was issued on July 29, 2004, and allowed 10 days from receipt for correction of deficiencies that included:

- Failure to submit an Environmental Protection Plan
- Failure to submit a Permit for Storm Water Discharge
- Failure to submit an Environmental Quality Board Permit
- Failure to submit Environmental Training Documentation
- Failure to submit the list of all activities that require 3-Phases of Quality Control
- Failure to submit a Safety Plan
- Failure to submit an adequate/proper Construction Schedule
- Failure to submit daily inspection reports
- Failure to submit certified payroll records
- Failure to meet mutually agreed upon dates for submission of supplemental information for proposals
- Failure to comply with Specification Section 01631, Products and Substitutions
- Numerous safety violations – 13 violations as of the date of the Cure Notice
- Failure to make arrangements and payment for electric and water usage
- Failure to work within the work hours specified in the contract and without advance notice to and approval by the Contracting Officer
- Failure to make timely payment to subcontractors
- Failure to have a supervisor/superintendent at the site as required

GNU submitted a response dated August 13, 2004, disputing the Government's assertions. However, GNU failed to comply or cure the above deficiencies within the allotted time and the Government issued another Cure Notice on August 30, 2004, which was based on negotiations that were held on August 25, 2004, and established new deadlines (August 30, 2004, for submission of outstanding documentation on pricing proposals and daily inspection reports; September 10, 2004, for certain documentation, such as a safety plan, schedule, and corrective action on safety violations; and September 15, 2004, for correcting other outstanding deficiencies, including submission of an environmental protection plan and training documentation, permits, and arrangements for temporary utilities).

However, GNU failed to adhere to the negotiated agreement. A Show Cause Notice was issued on November 23, 2004, as a result of GNU's failure to correct the deficiencies as follows:

- Failure to acquire permits (storm water discharge permit, environment quality board permit, and public works permit)
- Failure to submit environmental training documentation.
- Failure to provide a list of all activities that require the 3-phases of quality control

- Failure to perform, including failure to follow direction of the Contracting Officer regarding submission of required documentation and acquire permits, to seek approval to work outside of normal working hours, to seek inspection and acceptance of work.

GNU was given 21 days from receipt of the Show Cause Notice to respond. You submitted a response dated December 23, 2004, that advised that most of the documentation had been submitted and disputed the permit requirements.

During the period subsequent to GNU's response to the Show Cause Notice of November 23, 2004, no significant progress was made toward correcting deficiencies or completion of the contract. Consequently, another Cure Notice was issued on April 18, 2005, which provided a timeframe of 10 days from receipt to cure the lack of performance and advised that it appeared the contract would not be complete by August 17, 2005. It also identified multiple items of work that had not been started, corrected, or completed as indicative of lack of performance.

GNU's response dated May 3, 2005, disputed much of the Government's statements with the assertion that certain work was not critical, continued to allege that the Government was responsible for 496 days of delay, and that certain other work requirements were based on deficient specifications and drawings.

No significant progress on the contract had been made from January 2005 through July 2005, prompting a Show Cause Notice to be issued on July 15, 2005. At that point in time, almost 19 months after NTP was issued, the contract was approximately 50 percent complete with only one month remaining in the period of performance. A Termination for Default was issued on August 2, 2005.

Your performance was plagued with numerous deficiencies, including:

- Failure to submit appropriate/adequate plans, schedules, complete materials submittals, and proposals in a timely manner
- Failure to ensure adequate superintendence of the work
- Failure to ensure the presence of an onsite representative with the ability to make decisions regarding performance and other issues brought up during progress meetings
- Failure to conduct work within the normal work hours of the location or to seek the approval of the Contracting Officer to work outside normal work hours
- Failure to follow the instructions of the Contracting Officer regarding starting or stopping work
- Failure to comply with U.S. Department of Labor requirements regarding making appropriate payments to employees as required by the Davis-Bacon Act wage decisions
- Failure to comply with U.S. Department of Labor laws prohibiting the use and employment of illegal aliens
- Failure to comply with the Miller Act regarding the requirements to make timely payments to subcontractors and suppliers

- Failure to seek/submit for approval data on materials to be used prior to their installation
- Failure to make adequate progress and prosecute the work in a diligent manner

GNU alleges an improper termination based on scheduling issues and alleged untimely performance. GNU's untimely performance is readily apparent based on the percentage of completion at the time of termination. The contract performance period was from January 8, 2004, through August 17, 2005. At the time of default on August 2, 2005, the contract was approximately 50 percent complete.

The scheduling issues are the result of GNU's inability to properly schedule and manage their staff and their subcontractors, transmitting submitttals in a piece-meal fashion as opposed to the customary industry practice of submitting related documentation in a single package, and questionable management of the operation and logic of the scheduling software as identified in the schedule analysis performed by the Government. In addition to the above issues, GNU proposed inordinately high costs and long time frames for change orders and was unwilling to negotiate change orders in good faith, etc.

GNU's allegation that the cost to complete the project increased due to their termination is incorrect. Any increase in cost in the current performance is a result of bona fide change orders. Any increase in time is a result of negotiations between the Surety and the Government for certain change orders.

GNU's allegation that Carolina Casualty of America (GNU's Surety Company) was forced to pay higher prices under new and revised subcontract agreements will not be addressed here. The Government is not privy to the contents, terms and conditions, or costs of these agreements or the reasons why previous subcontractors may have refused to continue work on this project, aside from the Government's prior knowledge that some subcontractors were not paid by GNU in a timely fashion.

The decision to terminate this contract for default was not made lightly. You were provided multiple opportunities to cure performance deficiencies as indicated by three (3) Cure Notices and two (2) Show Cause notices.

As a result of the foregoing, it is determined that the Termination for Default is proper. Your claim is denied.

This is the final decision of the Contracting Officer. You may appeal this decision to the Civilian Board of Contract Appeals (which replaced the Agriculture Board of Contract Appeals) at the following mailing address:

Civilian Board of Contract Appeals
1800 F Street, NW
Washington, DC 20405

If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the Civilian Board of Contract Appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract number.

Instead of appealing to the Civilian Board of Contract Appeals, you may bring an action directly in the United States Court of Federal Claims within 12 months of the date you receive this decision.

Sincerely,

Regina M. Herchak

REGINA M. HERCHAK
Contracting Officer
Facilities Contracts Branch
Facilities Division